Anonymous v Anonymous (2018 NY Slip Op 05963)





Anonymous v Anonymous


2018 NY Slip Op 05963


Decided on August 30, 2018


Appellate Division, First Department


Manzanet-Daniels, J., J.



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on August 30, 2018
SUPREME COURT, APPELLATE DIVISION
First Judicial Department

Dianne T. Renwick,J.P.
Sallie Manzanet-Daniels
Angela M. Mazzarelli
Barbara R. Kapnick
Marcy L. Kahn, JJ.


103997/12 

[*1]Anonymous, Plaintiff-Appellant,
v
Anonymous, Defendant-Respondent.
State of New York, ex rel. Aniruddha Banerjee, etc., Plaintiff-Respondent,
v
Moody's Corporation, et al., Defendants-Appellants.



Plaintiff appeals from an order of the Supreme Court New York County (James d'Auguste, J.), entered November 30, 2016, which granted defendant Marsh & McLennan Companies, Inc.'s motion to dismiss the complaint as against it, with prejudice, and denied plaintiff's request to amend the complaint to correct the name of the Marsh corporate entity. The Moody's defendants appeal from the order of the same court and Justice, entered on or about February 15, 2017, which, insofar as appealed from, granted their motion to dismiss the complaint as against them only as to so much of the claim under section 189(g) of the New York State Finance Law as is based on the 2009 tax year and allegations of foreign tax arbitrage against defendant MIS Quality Management Corp. and so much of the retaliation claim as is based on the part of plaintiff's protected activity that is premised on communications with the New York State Office of the Attorney General.




Sullivan & Cromwell LLP, New York (Benjamin Walker, Sharon L. Nelles and Jennifer H. Blecher of counsel), for Moody's Corporation, Moody's Investors Service Inc., Moody's Assureco [*2]Inc., Moody's Assurance Company, Inc., MIS Asset Holdings, Inc. and MIS Quality Management Corp., appellants.
Kirby McInerney LLP, New York (David Kovel John R. Low-Beer and Seth M. Shapiro of counsel), and Beranbaum Menken LLP, New York (John A Beranbaum of counsel), for Anonymous/State of New York, ex rel. Aniruddha Banerjee, etc., appellant/respondent.
Seyfarth & Shaw LLP, New York (Jonathan P. Wolfert and Owen R. Wolfe of counsel), for respondent.



MANZANET-DANIELS, J.


On this appeal, we are asked to evaluate the sufficiency of plaintiff-relator's allegations concerning whether defendants submitted false claims concerning the appropriate amount of tax to be paid on account of defendant Moody's Assurance Company, Inc. (MAC), a captive insurance company formed pursuant to article 70 of the Insurance Law. We hold, at this stage, that the complaint sufficiently alleges that defendants knowingly submitted false claims.
New York's Captive Insurance Company Framework
In 1997, the New York State Legislature enacted article 70 of the Insurance Law in order to "facilitate the formation of captive insurance companies within the State of New York" (Insurance Law § 7001[a]). Article 70 enabled companies like Moody's to form captive insurance subsidiaries as a form of self-insurance, and granted favorable state tax status to captives licensed by the Department of Financial Services (DFS) (see Insurance Law § 7001). Under article 70, before a captive can be licensed, it has to submit an application to DFS that includes a certified financial statement, a charter and bylaws, and a plan of operation (Insurance Law § 7003[a][5][c][1]). In evaluating the plan of operation, DFS is to consider, among other things, "the amount and liquidity of [the captive's] assets relative to the risks to be assumed," (subd [c][2][A]), "the overall soundness of the [captive's operating] plan" (subd [c][2][C]), and whether the captive would be "able to meet its policy obligations" (subd [c][2][E]).
In addition, DFS has the right to inquire into the affairs of any licensed captive insurance company whenever "deemed necessary," and is required to undertake at least one examination every five years, to be conducted in accordance with the provisions of sections 310-313 of the Insurance Law (Insurance Law § 7007).
DFS has the right to suspend or revoke a captive license if it finds that the captive lacks sufficient capital to pay claims, fails to pay the required franchise taxes, or engages in illegal conduct or practices that would "render its operation detrimental or its condition unsound with respect to the public or to its policyholders" (§ 7008[a][8]).
The 1997 legislation also included new statutory provisions that granted favorable tax treatment to licensed captives. Whereas affiliated corporations with substantial intercorporate transactions are ordinarily required to file combined returns and to pay the New York corporate franchise tax, article 70 permits a licensed captive to file a tax return separate from its parent company's return and pay a special franchise tax on its premium income only, rather than the higher tax paid by most corporations on all of their income (see Tax Law §§ 209[4]; 1502-b; Insurance Law § 7012). "Premium" was defined at that time to include "any amount received by a captive insurance company as consideration for insurance provided ... to its parents and affiliated companies" (Tax Law § 1502-b[c]).
In 2009, responding to concerns that captives were depriving New York State of tax revenue on their nonpremium income by overloading their wholly owned insurance subsidiaries [*3]with property bearing no economic relationship to the writing of legitimate captive insurance policies, the legislature amended the law governing the taxation of captives (see L 2009, ch 57, part E-1, § 1, adding subd [11] to then Tax Law § 2). For a captive to qualify for favorable tax status under the new law, the majority of the captive's revenue has to consist of "bona fide" insurance premiums; a captive that does not satisfy that requirement is deemed an "overcapitalized captive insurance company" (OCCIC). An OCCIC is required to file a combined return with its parent, paying taxes on all of its income at the corporate rate. The term "overcapitalized captive insurance company" was replaced by the term "combinable captive insurance company" (CCIC) in 2014 (L 2014, ch 59, part A, § 20). To avoid classification as a CCIC under the new law, at least 50% of a captive's revenue must consist of premiums from arrangements that constitute insurance for federal income tax purposes.
Moody's Captive Insurance Company
In 2002, defendant Moody's Corporation formed defendant MAC as the captive insurer of defendant Moody's Investors Service. On June 14, 2002, DFS approved MAC's application and granted it a license to operate as a captive in New York. MAC provides coverage for, inter alia, acts of terrorism, excess commercial liability coverage, and reputational damage.
MAC paid taxes on its premium income at the lower rate available to captives, while Moody's deducted its premium payments to MAC from its taxable income. For the year 2009, Moody's treated MAC as an OCCIC because more than half of its revenue that year came from noninsurance sources. Subsequently, with the assistance of defendant Marsh & McLennan Companies, Inc. (Marsh), Moody's undertook a restructuring of MAC that adjusted its capitalization and revenues by transferring its intellectual property assets to a subsidiary, and then resumed its earlier tax treatment of MAC as a non-OCCIC captive insurer pursuant to Tax Law § 1502-b.
Moody's State and City Tax Audit Settlements
On or about January 11, 2012, Moody's and certain "combined affiliates" entered into a closing agreement with the State regarding taxes owed for the period January 1, 2004 through December 31, 2010. The "combined affiliates" were listed in exhibit A to the closing agreement and included MAC only as to tax year 2009.
On or about March 30, 2012, Moody's and certain "combined companies" entered into a closing agreement with the City regarding the audit period January 1, 2008 through December 31, 2010.
The closing agreements were "final, conclusive and irrevocable for the liabilities of the Taxpayer for the subject taxes, penalties, interest and Audit Period, and except upon a showing of fraud, malfeasance or misrepresentation of a material fact." In addition, the closing agreement with the State provided that nothing precluded the Department "from investigating and pursuing additional tax, interest and penalty due with respect to a reportable transaction' or a New York reportable transaction' referenced in New York State Tax Law Section 25 or an abusive tax avoidance transaction' referenced in New York State Tax Law Section 1083(c)(11)."
The Instant Qui Tam Action
On October 12, 2012, relator filed his initial qui tam complaint on behalf of the State. On August 9, 2013, relator filed his first amended qui tam complaint on behalf of the State and City, making essentially the same allegations. Both the State and the City were given the opportunity to intervene, but declined to do so.
Plaintiff relator asserts claims on behalf of the State and City against Moody's under section 189(g) of the State Finance Law (the False Claims Act [NYFCA]), alleging that Moody's "knew that MAC . . . did not qualify for the protections of the laws governing captive insurance companies," yet submitted "materially false and fraudulent" tax returns treating MAC as a legitimate captive.
Relator also alleges that he was unlawfully terminated by Moody's in 2011 in retaliation for raising concerns regarding Moody's tax treatment of MAC.
Moody's moved to dismiss the complaint, asserting, inter alia, that Moody's tax treatment of MAC both before and after the 2009 amendment of the statute was proper as a matter of law; that the complaint did not sufficiently allege that Moody's knowingly submitted false tax claims, as required by the NYFCA; and that the closing agreements barred relator's claims for the tax years covered by those agreements.
Order Appealed From
The motion court largely denied Moody's motion to dismiss, finding that the complaint sufficiently alleged a "reverse false claim" as to all but tax year 2009. The court found that the complaint sufficiently alleged that MAC should have been treated as a OCCIC, and thus, that defendants had submitted false claims in terms of their obligation to pay the appropriate amount of tax. The court cited relator's allegations concerning MAC's inability to pay claims if/when made, and the arrangement "circl[ing]" back the amounts paid in premiums to the parent as an unsecured note. The court reasoned that the allegations tended to demonstrate that the arrangement did not conform to traditional notions of insurance, noting that none of the policies had been entered into at arm's length, that the premiums paid to MAC were arbitrarily valued and not based on market considerations, and the fact that no claims had ever apparently been made, despite situations that were likely to have triggered coverage under the reputational insurance.
The motion court found the complaint sufficiently alleged that the NYFCA violation was "knowing," citing allegations regarding the arbitrary valuation of the intellectual property, the arbitrary valuation of the premiums, the fact that no claims had been made under the policies, and the fact that MAC's liabilities were not stated in investor disclosures and/or regulatory agency filings, indicating, according to relator, that defendants did not view MAC as presenting real economic liability.
The motion court found that MAC's formation, licensure and regulation by DFS was but one factor to consider in determining whether the captive's arrangement with related companies constituted "insurance" for purposes of the statutory framework, rejecting defendants' argument that MAC's licensure by the DFS definitely disposed of any alleged NYFCA violation, both with respect to establishing a false or fraudulent claim or the scienter element. The court observed that DFS's review of captives is limited to compliance with Insurance Law article 70, and pointedly not with Tax Law sections 1502-b or 2(11) and/or whether the captive provides bona fide insurance.
The court noted that once a license is received, the only aspect of a captive subject to ongoing DFS review and approval are proposed amendments or revisions to the bylaws. The court noted that while Insurance Law section 7008 lists reasons why a captive's license may be suspended or revoked, none of the enumerated reasons states that a captive's license may be revoked or suspended for being a CCIC or for not providing bona fide insurance. Similarly, although a five-year review is to be conducted pursuant to Insurance Law sections 310-312, such review did not revisit the initial licensure factors or whether the captive provides bona fide insurance. The court reasoned that any other construction of the statutes would place an unreasonable and unduly burdensome responsibility on DFS to determine the tax liability of every captive it regulated.
The motion court rejected defendants' argument that certain settlement agreements with the State and City barred relator's claims, reasoning that the documentary evidence did not "conclusively establish" that MAC was intended to be included and subject to any releases such as to bar relator's claims. The court reasoned, inter alia, that the consent forms could hardly be considered "settlement agreements" as they were signed by only defendants, did not contain [*4]release language, and did not prohibit further governmental action. More importantly, in the court's view, neither the consent forms nor the closing agreements with the State and City (which do contain release language, albeit with caveats, see supra) do not enumerate the specific entities covered. The court reasoned that MAC was not covered by the agreements (with the exception of the 2009 tax year) because it was not a "combined affiliate" for tax purposes and was not required to file a combined return with its parent. The motion court also invoked section 190(9) of the State Finance Law, which provides that a qui tam action under the article shall only be dismissed where any such settlement agreement with the State or City "has been approved in writing by the attorney general. . ." (id.).
Finally, the motion court found that relator's allegations concerning his "observations, investigations, and confrontations, demonstrate[d] his protected conduct and defendants' awareness of the same," as well as retaliatory motive, sufficiently alleging the elements of a retaliation claim under State Finance Law § 191. The motion court cited, inter alia, relator's complaints in August 2011 that the restructuring was likely illegal and that MAC was unlawful and its sole purpose tax avoidance; and relator's demands to know whether MAC's insurance policies constituted bona fide insurance during a subsequent conference call. The court granted the motion to dismiss to the extent the claim was predicated on relator's communications with OAG, however, because relator had not alleged that defendants knew of such activity.
Discussion
Liability under the NYFCA
The NYFCA applies to any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state or a local government" (State Finance Law § 187 et seq.; People v Sprint Nextel Corp., 26 NY3d 98, 106 [2015], cert denied __ US ___, 136 S Ct 2387 [2016]). In 2010, the legislature amended the statute to cover "claims, records, or statements made under the tax law" in certain circumstances (L 2010, ch 379, § 3, codified as State Finance Law § 189[4][a])[FN1]. While the typical NYFCA claim involves the State paying out money on account of a false claim, a "reverse false claim" occurs when someone uses a false record to conceal or avoid an obligation to pay the government (State of New York ex rel. Seiden v Utica First Ins. Co., 96 AD3d 67, 71-72 [1st Dept 2012], lv denied 19 NY3d 810 [2012]). A defendant knowingly makes a false claim under the NYFCA if the defendant had "actual knowledge" of the falsity of the claim or acted "in deliberate ignorance" or "reckless disregard" of its truth or falsity (State Finance Law
§ 188[3][a]).
The motion court correctly found that the complaint sufficiently alleges that Moody's "tax treatment of MAC was aggressive, risky, and/or abusive due to its sham nature," and that Moody's knowingly submitted false claims. In reaching this conclusion, the motion court cited to allegations, inter alia, that during the relevant period the insurance premiums that Moody's paid to MAC were arbitrarily valued and not based on any real consideration of market rates; that MAC has not paid out any claims, even in the case of reputational insurance;[FN2] that the royalty [*5]payments constituting a significant portion of MAC's pre-2010 income were arbitrarily valued; and the fact that the supposed "income" received by MAC flowed back to Moody's.
The complaint alleges that the 2009 restructuring was ineffectual and did not change the sham nature of the captive entity. The complaint further alleges that MAC transferred royalty-producing assets to a newly-formed subsidiary and arbitrarily reduced the payment stream by approximately two thirds in a fraudulent attempt to avoid overcapitalizing MAC with nonpremium income.
Although defendants take issue with the motion court's reference to federal case law to determine whether the insurance offered by MAC was "bona fide" under the 2009 amendment, defendants do not specify how State law differs from the federal standard, and do not take issue with the general proposition that insurance involves risk shifting and risk distribution, attributes relator alleges were lacking.
In 2014 the State amended the statute defining "captive insurance company" to specify that premiums must be from arrangements that constitute insurance for federal income tax purposes. Defendants seize upon this amendment to argue that the federal definition of insurance was inapplicable prior to the January 1, 2015 effective date of the statute and that the motion court erred in applying the federal tax definition of "insurance" in this case.
We reject defendants' argument that the motion court applied the incorrect law. Notably, defendants cite to no alternative State formulation of "insurance" or otherwise demonstrate that the definition of "insurance" in this state differs from the federal one.
A recent decision of the New York Tax Appeals Tribunal roundly refuted the notion that federal tax law was inapplicable prior to the 2014 amendment (see Matter of Stewart's Shops Corp., 2017 WL 3400766, 2017 NY Tax LEXIS 71 (NY St Div of Tax App DTA No. 825745, July 27, 2017]). As recognized by the motion court, the sine qua non of insurance is "risk shifting" and "risk distributing."
We similarly reject defendants' argument that DFS's licensure or oversight of MAC should be construed as an endorsement of its tax filings or as definitely negating the elements of any FCA claim. In order to be licensed, a captive must meet the requirements set forth in article 70 of the Insurance Law. The requirement that insurance be bona fide is contained in the Tax Law, not article 70 of the Insurance Law (Tax Law § 2[11]). A review by DFS would not concern itself with determining the bona fide status of insurance, nor with determining if a captive insurer is combinable under section 1502-b of the Tax Law.
It is true that upon an initial application DFS must evaluate the captive's assets and liquidity "relative to the risks to be assumed," as well as the "overall soundness of the plan" (Insurance Law § 7003[c][2][A],[C]). However, license renewals do not entail the substantive review suggested by defendants. DFS is not obligated to revoke a captive's license for not providing bona fide insurance, nor is revocation required when the conditions under section 7008 are met. Similarly, the five-year examinations contemplated under section 7007 do not entail review of factors relevant to a captive's tax status.
Settlements with State and City
Defendants assert that the instant qui tam action is barred by virtue of certain agreements between Moody's and the State and the City purporting to settle certain tax liabilities for the years 2004-10 and 2010-12, respectively.
We agree with the motion court that the agreements do not conclusively establish that [*6]relator has no cause of action as to warrant dismissal on this motion pursuant to CPLR 3211 (see Rovello v Orofino Realty Co., 40 NY2d 633 [1976]).
As an initial matter, the agreements do not address, and therefore do not preclude, relator's NYFCA claims relating to tax years not covered by those agreements.
The closing agreements by their terms do not release Moody's from actions amounting to "fraud, malfeasance or misrepresentation of material fact." Thus, to the extent defendants' liability under the NYFCA is predicated upon such a showing, relator's claim is not barred under the closing agreements.
In addition, paragraph 10 of the closing agreement with the State contains a carve-out for "abusive tax avoidance transaction[s]" referenced in section 1083(c)(11) of the Tax Law. Relator alleges, in essence, that MAC's captive insurance problem was "formed for the sole purpose of tax avoidance, as opposed to legitimate and non-tax driven reasons," removing the qui tam action from the scope of the release in the closing agreements.
Moreover, as noted by the motion court, the closing agreements do not purport to finally dispose of the liability of MAC, which was not a named combined affiliate and therefore not the "taxpayer" as defined in the State agreement (with the exception of 2009, which relator acknowledges). The "List of Combined Affiliates by Tax Year" includes MAC in 2009 but not in other years.
Further, as relator notes, Moody's is currently attempting to set aside the closing agreement with the State in a separate proceeding before the Division of Tax Appeals (see Matter of Moody's Corp., DTA No. 827396 [NY St Div of Tax Appeals, Nov. 16, 2017])[FN3]. If Moody's succeeds in setting aside the agreement in that forum, it would not be permitted to enforce it in this action.
In light of the foregoing questions concerning the applicability of the various settlement agreements, it is unnecessary to address relator's further contention that those agreements were entered into as the result of fraudulent inducement. We agree with defendants that the approval of the attorney general to enter into the settlements was not necessary given that the instant qui tam action was not yet pending when those agreements were entered into (see State Finance Law § 190[9][a][ii]).
Retaliation
In order to sustain a claim for retaliation under the NYFCA, relator must show that he engaged in protected conduct within the ambit of the statute, that his employer was aware of that conduct, and that he was terminated in retaliation for that conduct (see Krause v Eihab Human Servs., Inc., 2015 WL 4645210, *6, 2015 US Dist LEXIS 101820, *15 [ED NY Aug. 4, 2015, No. 10-CV-898 [RJD/SMG]). It is well settled that "[p]rotected activity is [to be] interpreted broadly" (Garcia v Aspira of NY, Inc., 2011 WL 1458155, at *4, 2011 US Dist LEXIS 41708, at *11 [SD NY Apr. 13, 2011, No. 07-Civ 5600 [PKC] [plaintiff's observations and confrontations with the defendant demonstrated that he had engaged in protected conduct]). The law requires only "a good faith basis or objectively reasonable basis for believing that the defendants were committing fraud" (Krause, 2015 WL 4645210, *8).
The complaint sufficiently alleges that defendants had knowledge of relator's protected [*7]activity and that they retaliated against him because of his protected activity. Relator alleges that he repeatedly complained about MAC's noncompliance with the tax laws to Moody's tax department as well as to his superiors, including vice-president Merkel, treasurer and chief risk officer Charles, and assistant treasurer Li. Relator alleges that he complained, inter alia, that the restructuring "was likely illegal," and that MAC was unlawful and "its sole reason for being was tax avoidance." Defendants' argument that relator did not engaged in protected conduct is groundless given his repeated protests about the captive's failure to comply with tax laws.
Amendment of Complaint to Include Marsh
The motion court abused its discretion in dismissing the complaint as against Marsh with prejudice and denying plaintiff's request to amend the complaint to assert his claim against the correct corporate entity. Although plaintiff did not make his request to amend in a formal motion pursuant to CPLR 3025(b), the amendment will not result in prejudice to any defendant and is not futile (see CIFG Assur. N. Am., Inc. v J.P. Morgan Sec. LLC, 146 AD3d 60, 64-65 [1st Dept 2016]; Amaro v Gani Realty Corp., 60 AD3d 491, 493 [1st Dept 2009]).
Accordingly, the order of the Supreme Court, New York County (James d'Auguste, J.), entered November 30, 2016, which, granted defendant Marsh & McLennan Companies, Inc.'s motion to dismiss the complaint as against it, with prejudice, and denied plaintiff's request to amend the complaint to correct the name of the Marsh corporate entity, should be reversed, on the law, without costs, the motion denied, and plaintiff's request granted. The order of the same court and Justice, entered on or about February 15, 2017, which, insofar as appealed from, granted the Moody's defendants' motion to dismiss the complaint as against them only as to so much of the claim under section 189(g) of the New York State Finance Law as is based on the 2009 tax year and allegations of foreign tax arbitrage against defendant MIS Quality Management Corp. and so much of the retaliation claim as is based on the part of plaintiff's protected activity that is premised on communications with the New York State Office of the Attorney General, should be affirmed, without costs.
All concur.
Order, Supreme Court, New York County (James d'Auguste, J.), entered November 30, 2016, reversed, on the law, without costs, the motion denied, and plaintiff's request granted. Order, same court and Justice, entered on or about February 15, 2017, affirmed, without costs.
Opinion by Manzanet-Daniels, J. All concur.
Renwick, J.P., Manzanet-Daniels, Mazzarelli, Kapnick, Kahn, JJ.
THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: AUGUST 30, 2018
DEPUTY CLERK



Footnotes

Footnote 1:In People v Sprint Nextel Corp., the Court held that retroactive application of the NYFCA in a tax case was not barred by the ex post facto clause (26 NY3d at 113).

Footnote 2:Moody's maintains that plaintiff has "conceded" that MAC has in fact paid out claims. Plaintiff disputes this characterization, and asserts, in any event, that certain losses claimed, even if legitimate, were attributable to "smaller policies added in June 2008 to provide a veneer of bona fide insurance," noting that such policies comprise less than 10 percent of the premiums collected by MAC.

Footnote 3:Moody's claims, somewhat disingenuously, that the proceeding before the Division of Tax Appeals is merely one for a refund. While involving a different substantive issue, Moody's in that proceeding asserts that "fraud, malfeasance, or misrepresentation of a material fact" constitutes a ground for setting aside the closing agreement and reopening the matter.